### AT HAWKINSVILLE,

### JUNE TERM, 1847.

No. 57.—RICHARD WAYNE, trustee *et al.* plaintiffs in error *vs.* AUGUSTUS MYDDLETON, defendant in error.

[1.] William Pelot conveyed by deed certain slaves to Levi S. D'Lyon, in trust, for the sole and separate use of his wife Elvina Pelot, during her life, and after her death to her children. The deed authorized the *cestui que trust,* Mrs. Pelot, by and with the advice and consent of her trustee, to sell and dispose of the trust estate whenever she shall deem it proper to do so, and to re-invest the proceeds upon like trusts. Mrs. Pelot purchased from Augustus Myddleton a tract of land, the growing crop thereon, and also the stock of cattle, and hired the services of three negroes belonging to Myddleton till the close of the year, to asssist in the crop, for the sum of $1,476. Two notes were given by her for the amount, which were to be secured by a mortgage on the four slaves embraced in the trust deed, and by a mortgage on the land. *Held,* that it was competent for Mrs. Pelot to make this contract.

This was a bill for a specific performance, instituted by the plaintiffs in error, against the defendant in error, in Chatham Superior Court, and tried before Judge FLEMING. May Term, 1847.

William Pelot conveyed by deed certain slaves to Levi S. D'Lyon, Esq. in trust, for the sole and separate use of his wife Elvina R. Pelot, during her life, and after her death to her children. There are several children in life; and the deed authorized the *cestui que trust,* Mrs. Pelot, by and with the advice and consent of her trustee, to sell and dispose of the trust estate whenever she shall deem it proper to do so, and to re-invest the proceeds, &c.

upon like trusts. Mrs. Pelot, being desirous of purchasing a small farm near Savannah, contracted with Augustus Myddleton for it, with the approbation of her trustee, at the price of $800. The growing crop, stock, cattle, &c., and the hire of three negro slaves belonging to Myddleton, to assist in the crop till the close of the year, were included in the contract, and all amounted to $1,476. No cash was to be paid down, but the payment was to be secured by a mortgage on the four slaves in the trust deed, and also by a mortgage of the land. To consummate the agreement, Mrs. Pelot gave her two notes for $738 each, and also a mortgage on the four slaves owned by her as separate property, which said mortgage was also signed by her trustee. When the title to the land from Myddleton, and the mortgage from Mrs. Pelot and her trustee were exchanged, they were found to be defective ; the title made by Myddleton was returned to him, and it was agreed that the title should remain in Myddleton until the notes were paid, as the mortgage which had been made to him had, by mistake, omitted the land. The crop, cattle, &c., and the services of the slaves, all valued at $676, were received by Mrs. Pelot by the consent of her trustee, and the land taken possession of by her. Upon failure to pay the first note, Myddleton foreclosed the mortgage, and sold the slaves in the manner required by law, and received therefrom the net amount of $851 89, which being insufficient to pay the debt, he commenced an action of ejectment against the tenant of Mrs. Pelot for the land. Whereupon the *cestui que trust*, Elvina R. Pelot, and her then trustee, the plaintiff in error, filed their bill against Myddleton, to compel him to execute titles to the land.

Upon the trial of this bill, the Court below, upon the foregoing facts, charged the jury as follows :

The charge is given entire, it having been reduced to writing by the presiding judge.

" GENTLEMEN OF THE JURY :

" The first question to which I call your attention is the question, how far the separate property of a married woman is liable for any contracts or debts created by her during her coverture. Before stating my views on this subject, however, it is perhaps proper to notice one idea that has been advanced by counsel. That idea is, that the question above stated cannot arise in this case, inasmuch as Mrs. Pelot has no separate property under

the trust deed to Mr. D'Lyon—that it is the property of herself and children. On turning to that deed we find that the property is conveyed "in trust to and for the *sole* and *separate* use, benefit and behoof, of Mrs. Elvina Rosalie Pelot, and after her decease to such child or children as she may have living at the time of her death." Do not these terms convey to Mrs. Pelot a life estate in this property, and is it not by its very terms a sole and separate property? I am clear in the opinion that Mrs. Pelot had a separate property in these negroes during life, with remainder to her children living at the time of her death, and I so charge and instruct you.

"And now the question presents itself, how far this separate property is liable for any contracts or debts created by her, during her coverture. At law, gentlemen, she can make no contract binding her person or property; in equity, however, remedy may be had against her separate estate. And even in equity, remedy will not be granted unless it appear that it was her intention to charge her separate estate. But it is not necessary that this intention should be expressed upon the face of the contract; this intention may be implied from circumstances. And just here is the great difficulty in all cases in which this question arises. What are the circumstances which will be deemed sufficient proof of this intention? It has been held, and I think correctly held, that if a married woman, having a separate estate, executes a bond, makes a note, accepts a bill, she must be supposed to have designed a charge upon her separate estate, since in no other way could the instruments thus made by her have any validity or operation. 2 *Story Eq. Jur.* 776.

" If the above acts standing alone, is proof of such intention, the additional fact that she has procured the consent of her trustee, certainly does not weaken that proof, on the contrary it greatly strengthens it. And if the making of a note is proof of such intention, then surely the giving a mortgage of the trust property to secure that note, adds very much to the weight of that proof; and if the trustee gives his assent to the mortgage, it seems to me that the proof becomes irresistible and overwhelming. Your opinion of the facts in this case gentlemen, will of course control you in the application of these principles in making up your decree.

The other points made in this case by complainants' counsel, depend entirely upon the question, what was the contract between these parties? It has been argued that the trustee had no power

to mortgage this land, as it would be risking the existence of the trust estate; that the defendant knew he was dealing with trust property, and that equity would follow trust property in the hands of the purchaser, and make him a trustee for the purposes of the deed. In other words, the argument is, that the mortgage of the land could not have been the contract, because the parties could not make such a contract; that if such was the contract, the Court will not enforce it, because it would destroy the trust estate. If the trust deed empowered the parties to mortgage the negroes, the subject of the original trust, I cannot see how the power is destroyed in reference to after acquisitions of property to the trust estate; on the contrary, I think that the power to mortgage property purchased for the benefit of the trust estate, less doubtful, especially when that mortgage is to secure the purchase money. You will not understand me gentlemen, as intimating an opinion that the contract was, that this land should be mortgaged, I only mean to say, that in the opinion of the Court, the party had full power to make such a contract; whether or not such a contract was made, is a matter exclusively for your consideration. The remaining idea is, that the Court would not enforce such a contract to the destruction of the trust estate. This contract, or rather I should say, whatever contract was made, was made with a view to benefit the trust estate; if profitable, the trust estate would receive the benefits; if loss accrues, where, gentlemen, in equity and good conscience, ought it to fall? If the property sold had risen in value to double the price at which it was sold, who would have received the benefit? Is it equitable, is it right, that you should give all the profit to one and visit all the loss upon the other? It is not pretended that the property sold was not worth, at the time of sale, the amount of the notes. Now if part of the property thus sold has been squandered, and if the negroes, because of the party's failing to meet his notes, have been sold at an under value, are the consequences of complainants' failure to pay the notes to be visited upon the defendant? Is the fact that this is trust property to exempt it from that omnipotent principle of universal justice, that he who is to have the profit must run the risk? It is not denied that equity will protect the capital of trust property from the debts of the *cestui que trust;* but will equity protect trust property from a mortgage given to secure a debt contracted for its benefit? If it would, then have I yet to learn what justice and equity mean. The fact that the defendant knew that he was deal-

ing with trust property, does affect this case, because knowing that fact, he was careful to deal only with those who had authority to deal with him.   Whilst therefore it is true, that equity will follow trust property in the hands of a purchaser with notice, yet it will not follow trust property in the hands of a purchaser who purchases from one authorized to sell.

"I come now to the question which is really the important question in this case.   What was the contract between these parties? Because, if I am right thus far, the actual contract between these parties is the contract which you ought to enforce.   In what I have said, I have intended to express the opinion that these parties were competent to contract; and that contract, whatever you find it to be, you should enforce by your decree.   Gladly would I leave this question to you under the testimony; but I am not permitted to do so; it is my duty to instruct you as to the legal effect of the defendant's answer, as testimony in this cause.   The law, gentlemen, is plain enough; its application to the particular case is the difficulty; I will give you the law and then attempt to apply it to this case.   I state to you then, as law, that the answer of the defendant, so far as it is responsive to the allegations or the interrogatories of the bill, is conclusive, unless contradicted by two witnesses, or one witness and strong corroborating circumstances.   To apply this law to the bill and answer in this case, is the difficulty.   It is surely unnecessary to compare every allegation in the bill with the answer of the defendant; let us come at once to the important allegation and see if the answer is responsive.   You will bear in mind, gentlemen, that the great question is, whether the land was or was not to be mortgaged according to the terms of the contract between these parties.   Now what does the bill allege in regard to this contract?   It alleges that the said Elvina R. Pelot, for certain reasons, "was desirous to purchase of and from one Augustus Myddleton a small plantation.   That in pursuance of such desire she applied to the said Augustus Myddleton for the purchase of said plantation; that, after consultation with her friends, she agreed with the said Augustus Myddleton for the purchase of said plantation for the sum of eight hundred dollars. That the crop then on the plantation, and other personal property, were purchased, amounting to the sum of fourteen hundred and seventy-six dollars."   But the bill charges distinctly that the purchase of the land, and the purchase of the crop and other personal property, "were separate and distinct transactions, and were

united in the same mortgage upon the negroes, to give the said Augustus Myddleton a lien on the negroes for the surplus they might be sold for, after paying the eight hundred dollars for the land." The bill also alleges that the said Augustus Myddleton " made and executed warranty and fee simple titles to said lands," but that upon examination it was discovered that the lands were conveyed directly and absolutely to the said Elvina R. and not to her trustee, according to the terms of the original trust deed; that upon this discovery the deed was returned to the said Augustus, he promising and agreeing to have another deed properly made out and executed to the trustee of the said Elvina R. according to the terms of said deed from the said William M. Pelot. The bill propounds to the defendant the following questions:

' Whether the said Augustus Myddleton and the said Elvina R. Pelot with the consent of the said Levi S. D'Lyon, did not bargain and agree for the sale and purchase of said plantation at and for the sum of eight hundred dollars?

' Whether the contract for the purchase of the personal property was not subsequently made?

' Whether the fee simple title charged in the bill to have been executed by the said Augustus, was not returned to him for the reasons stated in the bill?

'Whether the said Augustus did not receive the same back for correction, by executing a deed to the trustee upon the same trusts and uses, &c ?'

"Now let us see how these questions and allegations have been answered. The answer denies that the purchase of the land and of the personal property were separate and distinct transactions, and asserts that they were one. Is not this answer responsive to the allegation, that they were separate and distinct? The answer denies that it was agreed, or intended to be agreed between the parties, that the land should be discharged when the sum of eight hundred dollars should be paid, and asserts that he refrained from insisting upon a mortgage upon the land, or to have the old mortgage altered to include it, because of the express understanding that he was to retain the title to the land in himself, until both notes were paid. Is not this answer responsive to the allegation that the object of embracing both notes in the mortgage upon the negroes, was to give the said Augustus a lien on the negroes for the surplus they might be sold for, after paying the eight hundred

dollars for the land ?   The answer asserts, that the fee simple title mentioned in complainant's bill, was returned to him upon the agreement and understanding, that matters might remain so until both notes were paid.   Is not this answer responsive to the allegation, that this title-deed was returned to him upon his promise and agreement to have another deed, properly made out and executed ?

"In the above particulars, gentlemen, I believe, and accordingly I charge and instruct you, that the answer is responsive to the allegations of the bill, and that the answer thus responsive is conclusive, unless contradicted by two witnesses, or one witness and strong corroborating circumstances.   It is, gentlemen, peculiarly your province to say, if these circumstances exist in this case.

"The instructions asked for on the third point by defendant's counsel, I believe to be law, but whether they apply to this case, is a matter for your determination.   If the contract between these parties is the contract claimed in complainant's bill, to wit, that the land was not to be mortgaged, but to be freed from incumbrance, and that the defendant agreed to look exclusively to the negroes for payment of his notes, why then these instructions will not benefit the defendant; but if the contract be, as claimed by defendant, then these instructions will operate to his advantage. What the contract was, the answer is evidence in the particulars I have mentioned ; and conclusive, unless you find that it has been contradicted by two witnesses, or one witness and strong corroborating circumstances."

To which said charge of the presiding Judge, the Solicitors for the complainants excepted generally and more particularly —

"First. Because, although it be true that Mrs. Pelot had a life estate in the trust property, with remainder to her children, yet by the deed she had no power either with or without the consent of her trustee, to mortgage the trust property, so as to hazard and destroy the trust estate.   Her only power under the deed was, to sell the property with the advice and consent of her trustee, and to re-invest the proceeds upon the same uses and trusts; a party, therefore, with knowledge of the trusts, taking a mortgage from her which he knew she had no right to give, will be followed in equity, so as to prevent the trust estate from being destroyed by such illegal transaction.

"Second. Because Mrs. Pelot had no separate estate in this

trust property, which enabled her to bind, charge, or alien it by her contract, except in the mode and to the extent declared and authorized by the trust deed, and if she had, it could only be to charge the income during her life, in the hands of the trustee, and not to defeat or destroy the remainder.

" Third. Because, even if by the deed the parties had the power to mortgage the trust estate, for the purpose of acquiring by purchase other trust property, to stand in the place of, and be substituted for the property mortgaged, it does not follow that they would also have power to mortgage at the same time the thing purchased, and thus defeat the remainder ; and a person so dealing with them, with full knowledge of the trust, would himself become a trustee in equity for the *cestui que trust* in remainder.

"Fourth. A court of equity will never suffer trust property, knowing it to be trust property, so to be dealt with, as to break in upon and destroy the capital and defeat the rights of remainder men, and consequently a court of equity will not suffer a contract to be enforced through it, nor lend its protection to a party, when it would be productive of such consequences.

" Fifth. Because, if property is covered with a trust, no change of its state or form can divest it of such trust, or give the trustee converting it, or those who claim in privity with him, any greater right than before the change. That consequently the negroes being converted, through the means of the mortgage, into the land, with the knowledge of Myddleton that the negroes were covered by the trusts of the deed, the land became in his hands immediately covered with the same trusts." Upon these exceptions errors were assigned.

Wᴍ. & Wᴍ. F. Lᴀᴡ, for the plaintiffs in error.

His honour the presiding Judge, having reduced his charge into writing, and the exceptions taken having stated distinctly the grounds of objection, and the legal and equitable principles supposed to have been violated, the plaintiffs in error have little more to do in presenting this case to the court than to support the grounds assumed in the exceptions by the authorities.

The right of a married woman to act with regard to her separate property as a *feme-sole,* with the various limitations, explanations and modifications which different judges have fixed to that rule, *(see Clancy on Rights,* 288, 289, *et. seq.)* seems to us to be

an unimportant inquiry in this case. That doctrine is applicable to cases in which the *feme* has the absolute right to the property and power of disposition over it. The present is a case in which property is settled in trust for the benefit of the family; for the wife for life, remainder to the children. She has no power of ultimate disposition, she cannot destroy the interests in remainder; she can do no act but what is conferred upon her by the deed. What is that power in this case? Simply in case of necessity, or for the benefit and advantage of the family, to sell the property with the consent of the trustee, and to re-invest the proceeds in more advantageous property. She had no authority to speculate on this property; strictly she had no right to mortgage it—and if by any construction that could be given to this power, she had such right, its exercise could only be sustained by a substitution of the thing purchased in the place of the trust property mortgaged. See upon this subject 2 *Story Eq. Jur.* 616, *and note* 2; *Jacques* vs. *Meth. Epis. Church,* 3 *John. C. R.* 77, 86 *to* 114.

In a case of this kind, where the object was to provide for the family, where the wife had but an interest for life with remainder to her children, she can only dispose of the property for the purpose and in the manner prescribed in the deed. A power to sell and re-invest is not a power to mortgage: by thus extending the power you hazard the estate and defeat the remainder.

No principle is more familiar to a court of equity, than that a party who purchases trust property, knowing it to be such, in violation of the objects of the trust, holds it subject to the trust. 2 *Story Eq. Jur.* 503, *sec.* 1257.

It is not pretended in this case, that Myddleton was ignorant of the legal character and condition of the slaves mortgaged; he dealt with the trustee in the negotiation; it is conceded, that he knew it was trust property; he had to get the consent of the trustee to his mortgage. Knowing that it was trust property, he was bound to look to the power to mortgage. Having taken this mortgage and sold the trust property and applied the money to himself, equity will compel him to execute titles and substitute the land in the place of the negroes, which is the extent of the power conferred by the trust deed.

We do not multiply authorities on these points, they are all collected by Chancellor Kent in the case in 3 *John. Ch R.*, already referred to by Judge Story at the above reference: by 1 *Fonbl.*

*Eq. b.* 1, *ch.* 2, *sec.* 6, *note* 9; *Sugden on Powers, ch.* 2, *sec.* 1, *p.* 113 *to* 119, 3 *ed.*

Second. But admitting all that his honour the Judge said, as to the power of a married woman to bind her separate estate by her contracts, &c. to be true, it could only be applicable to this case to the extent of her separate interest; that was but a life interest: she could not pledge or bind more than she had; the trust deed regulates her rights—she could only charge the income during her life in the hands of the trustee. This is the principle affirmed in *Bulpin* vs. *Clarke*, 17 *Ves. jun.* 365, where the estate was settled for separate use of a married woman for life. It has been followed by several American decisions. Beyond this the courts have not gone. They will never suffer the capital to be broken in upon and destroyed, where there are interests in remainder, and especially children.

It is laid down in South Carolina, that a married woman can do no act which tends to the destruction of her trust estate. As where she gave a note with her husband, upon which judgment was obtained, and the trust estate sold, a court of equity will enjoin the proceedings at law. *Watson* vs. *Cheshire*, 1 *McCord's Ch. R.* 241; *Ewing* vs. *Smith*, 3 *Dess. R.* 417.

The power of a married woman over her estate does not extend beyond the plain meaning of the deed creating the estate. She is therefore to be considered only a *feme-sole*, so far as the deed has expressly conferred on her the power of acting as a *feme-sole*. *Morgan* vs. *Elam*, 4 *Yerger*, 375.

She must dispose of the estate in the manner pointed out in the instrument. *Grimke* vs. *Grimke's Execu.* 1 *Dess. R.* 366.

When the separate estate of the wife is vested in a trustee for the benefit of the wife and children, she cannot make a lien or charge upon it beyond her own interest, so as to affect the rights of the children. 7 *Paige*, 9.

Third & Fourth. The third and fourth exceptions may be considered together.

The contract claimed by the answer is, that the negroes were to be mortgaged and also the land. Whence was this power derived? Surely not from the trust deed. That made a provision for the children. But the act sought to be established, destroys that provision by destroying the estate. And a court of equity is called on to sustain such a contract. Sanction such a principle, and where will you affix its limits? The wildest speculations may

be entered into upon the pledge of trust property; instead of buying a farm, the tenant for life and trustee may enter into a cotton speculation, and what becomes of the provisions of prudent parents for helpless children? Would the Court have sanctioned this contract if application had been made to it? Will it confirm now what it would not have authorized? The Court will not allow the capital of a trust estate to be broken in upon, not even for maintenance, but in rare cases, and under peculiar circumstances. 6 *Vesey, jun.* 473.

A trustee and tenant for life joining in a conveyance, to bar the remainder man, is guilty of a breach of trust. 16 *Vesey, jun.* 283.

In all cases of purchases of trust property with notice of the trust, equity will hold the purchaser a trustee for the benefit of the persons whose rights have been defeated. 1 *Story Eq. Jur.* 384, *sec.* 395, *and authorities there cited;* 1 *John. Ch. R.* 566; 4 *John. Ch. R.* 436; 2 *Story Eq. Jur.* 502, 503, *sec.* 1257.

Where a party purchases trust property knowing it to be such, in violation of the trusts, equity forces the trust upon the conscience of the purchaser and will compel him to perform the trust, and to hold the property subject to it in the same manner as the trustee held it. So, also, persons colluding with trustees in a known misapplication of assets, are made responsible for the property in their hands.

Fifth. But this is not precisely the naked case of a purchase of trust property in violation of the trust, with knowledge of the fact. It is a sale of property to the trust estate upon a mortgage of the trust estate. It is in other words a change of the trust estate into the land; the land then, which, by this arrangement was to be substituted in place of the trust estate, cannot be withheld and retained by the person who has so dealt with the trust, and for whose benefit the trust estate has been sold.

Upon this subject Judge Story says, wherever the property of a party has been wrongfully misapplied, or a trust fund wrongfully converted into another species of property, there, if its identity can be traced, it will be held in its new form liable to the rights of the original owner, or *cestui que trust.*

The general proposition is, that if any property in its original state and form is covered with a trust, no change of that form can divest it of such trust, or give the agent or trustee converting it, or those who represent him in right, (not being *bona fide* purchasers without notice,) any more valid claim than they had before such

50

change. An abuse of a trust can confer no right on the party abusing it, nor on those who claim in privity with him. 2 *Story Eq. Jur.* 503, 504, *sec.* 1258.

The trust estate in the slaves is gone, they have been sold— but the land, to buy which they have been sold, and into which they have been converted, remains; and the question is, whether a court of equity will let that go too, and suffer the trust estate to be destroyed and the interests of the children wholly defeated, and this in favour of one who dealt with this estate with full knowledge of the trusts.

It was said in the argument in the Court below, that here is the *cestui que trust,* tenant for life, seeking to take advantage of her own acts — but that is not the fact; this bill was originally filed by the trustee alone, to protect the interests of the children, and we were required by the Court upon the objection of defendant's solicitor, to make Mrs. Pelot a party.

And now with respect, it seems to us that the essential error in the charge of his honour the presiding Judge was—

First. In the application of general principles which obtain in cases where a married woman has an absolute separate estate, with an absolute power of final disposition, (in which case she may bind it by her acts and contracts,) to a case in which she had but a life estate with remainder over, in which case she can only act in the manner and to the extent prescribed by the deed, and can certainly bind no more than she possessed.

Second. In charging that these parties under the trust deed had a right to mortgage both the trust estate and the thing purchased to secure the purchase money; or indeed to mortgage at all.

Third. In the annunciation of that *omnipotent principle,* that he who is to have the profits must bear the loss, as applicable to this case.

Shall the trust be entirely defeated because by a breach of trust the trust property has been hazarded in a speculation with one who has knowledge of the trust, and profits may possibly be gained ? We do not so understand the doctrine. The equity of a creditor to render a trust estate liable for his debt, is, that he has advanced his money, or given his credit to *effect the objects* of the trust, not to *defeat and destroy* the objects of the trust. 1 *Hill,* 232.

And even a *bona fide* creditor, who has advanced his money or furnished supplies for the benefit of the trust, can only be remunerated out of the income. Courts of equity will not permit the capital to be applied for that purpose.

We humbly conceive, that the charge commenced upon wrong principles, by overlooking the nature of this trust estate, the power conferred and objects to be attained by the trust deed, the life interest only of Mrs. P., and the interest in remainder in the children; all the conclusions, therefore, however seemingly just, partake in their application to this case, of the error in the principles in which they originate.

ROBERT M. CHARLTON, for the defendant in error.

Stripping the bill and the case of the plaintiff from all the surplusage and ingenuity which have been thrown around it, it is an effort by persons who made an agreement to purchase land and other property, for fourteen hundred and seventy-six dollars, ($1,476) who have paid but eight hundred and fifty-one dollars and eighty-nine cents; ($851 89) who allege no fault or unfairness in defendant; who do not pretend to have paid the balance, and who do not even offer to do it; nay, who say that the property thus purchased from us shall be held discharged from any claim on it, on our part, for the purchase money; and yet who seek to procure from a court of equity a decree compelling us to abandon our legal title to them.

I am justified in saying that this is the most unexampled effort that the annals of equity jurisprudence have ever presented.

It is true that a court of equity will compel a man to perform specifically his agreement, but I deny that it will do so unless it would be strictly equitable to make such a decree; nor unless the complainant who asks equity will do equity.   2 *Story Eq. sec.* 750, *and* 750 *a*, 759, 771;  *Fonbl. Eq.* 48;  *Morgan's heirs* vs. *Morgan,* 2  *Wheat. R.* 299.

The complainant who asks a specific performance must be in a condition to perform his own part of the contract, and he must have shown himself to be " ready, desirous, prompt and eager to perform the contract."   2 *Story Eq. Jur. sec.* 776;  *King et al.* vs. *Hamilton et al.* 4 *Peters R.* 311; *see also pp.* 313, 314, 326, 328, 329, 330.

This rule is founded upon such natural justice, and is supported by such an overwhelming and unbroken current of authority, that any exception that is attempted to be set up, must be supported by very cogent reasons before it shall be suffered to drag from us our

property without paying us for it, and convert it into trust prop-
erty free from any liability to us.

Let us examine the exceptions of complainant, *seriatim.*

First. The first denies that Mrs. Pelot had any power, either
with or without the consent of her trustee, to mortgage the trust
property, so as to hazard and destroy the trust estate; that her only
power was to sell and re-invest, and that a party therefore, with
knowledge of the trust, taking a mortgage from her, will be follow-
ed in equity, so as to prevent the trust estate from being destroyed.

There is a strange mixture in this exception of assumed facts,
that do not seem to us to exist, and of law, that can scarcely be said
to be applicable.

By the trust deed power is given to Mrs. Pelot, by and with the
advice and consent of her trustee, to sell and dispose of the trust
estate " *whenever she shall deem it proper to do so,*" and to re-invest
the proceeds, &c.

A power " to sell" includes a power to *mortgage.* 4 *Kent Com.*
*3d edit.* 147; 15 *Law Library, (Sugden on Powers,) t. p.* 285; *Mills*
vs. *Banks,* 3 *Pr. Wms.* 9; *Powell on Mortgages,* 81, 82.

If she had the power to sell the trust slaves, (and thus utterly and
forever to destroy all claim of the *cestui que trusts* therein,) for the
purpose of re-investment, it seems difficult to understand why she
could not exercise a lesser power by mortgaging the same property,
and thus procure funds for re-investment. How can the mortgage
be said to " hazard and destroy" the trust estate more than the
sale ? If both or either transaction was fair, the trust estate would
receive an equivalent, which equivalent could be re-invested, as di-
rected by the trust deed. It is not denied that this was a fair
transaction, and that the land, &c. was sold at a fair price.

How was the trust property hazarded and destroyed by the
transaction? It received personal property from defendant of the
value of $676, as proved by the evidence; the slaves mortgaged
brought upon the sale, conducted in the manner prescribed by
law, but $851, which is but little more than the value of the per-
sonal property sold by defendant, which has already been con-
verted into trust property. The balance between $676 and $851,
has gone as a credit upon the purchase of the land; and upon
payment to us of the amount due to us the land will become trust
property.

What offence has Myddleton committed, that puts him beyond

the protection given to others? He agreed to sell his property for a fair price, and to execute a title to the land when he should have been paid the purchase money. Is there any thing unfair or unjust in this condition? Can the fact that he was selling to a lady having separate estate and her trustee, change the immutable principle of justice, that no one shall have his property taken from him against his consent, without satisfaction made to him for it?

Can the fact that he took a mortgage of property as security for the purchase money vary the rule? Suppose that by the contract of purchase the trust slaves were to have been sold to Myddleton as part payment of the property purchased from him, the price of said slaves to have been ascertained by putting them at public outcry, and Myddleton to take them at the amount the highest bidder should offer for them, would there have been any thing illegal or inequitable in this? Would it not have been emphatically a sale and re-investment? What possible difference can there be, between the case suggested and a mortgage of the said slaves to secure measurably the purchase money, with a proviso that upon failure to pay at the time specified, Myddleton should foreclose the mortgage and sell the slaves at public outcry, and credit the price the highest bidder offered and gave for the slaves?

The exception then cannot be sustained. The trust estate has not been hazarded or destroyed by the mortgage—but if hazarded at all, it was by the misapplication of the personal property received from Myddleton, (of which we know nothing,) and if the slaves were bid off below their value, it was because of the statements of the friends of complainants, made at the time and place of sale, that the slaves were to be bought in for the benefit of Mrs. Pelot; whether they realized that benefit we know not. It was his interest that the slaves should bring the highest price, but his poverty kept him from bidding upon them. How can we be "followed in equity?" Followed for what? We never had any of this trust estate in our hands. We have our own land, which we are "anxious, eager and ready" to convey to complainants in strict compliance with our contract, when they shall have fulfilled their contract by paying us for it. Until then, it is neither equitable nor just, to take it from us.

Second. The second exception denies the right of Mrs. Pelot to bind or alien the trust property, except in the mode authorized in the trust deed; at all events except during her life, and not to defeat or destroy the remainder.

The answer to all this is short and conclusive.

Without stopping to ask whether the power could not have been exercised without the intervention of her trustee — see *Liptrot* vs. *Holmes*, 1 *Kelly R.* 389,) it is sufficient to say, that with the consent of her trustee she executed this mortgage and made this purchase, in the manner prescribed by the trust deed; and though she had only a life estate, yet the trust deed gave her the power, with the consent of her trustee, "whenever she should deem it proper to do so," to sell and dispose of these slaves for the purpose of re-investment; and thus to *destroy* the claim of *all* the *cestui que trusts* therein; and she has done no more than this.

But, in truth, this exception is irrelevant, because our land was never trust estate, and no one has or can change or alien it but ourselves.

Third. The third exception has been virtually answered already. If a party, trustee, should purchase property of greater value than the trust estate, and giving the trust estate in part payment, or mortgaging it to secure in part the purchase money should also consent that the property purchased should also be mortgaged to secure the seller in his just claim — it seems to me that the agreement would be just and fair, and equitable for one acting for himself, to make, and therefore it cannot be unfair or unjust in him, as trustee, to enter into it. It is almost too plain a principle of ethics to argue, and I forbear.

Fourth. The fourth exception is but "a new phase of the same moon." It is true that a court of equity rarely permits the capital of the trust estate to be broken. But we have not brought ourselves within this rule. We agreed to sell our property, and when the purchase money should be paid to us, we promised to convey. If the trustee and the *cestui que trust* had faithfully complied with their promises, and had not mismanaged, (if it be so,) the property purchased from us, and by their representations to the bidders at the public sale of the slaves, caused the said slaves to be sold at an alleged depreciated value, they would have had now a trust estate superior to the original one. These are not acts that we have been guilty of, or are responsible for. If the trustee has acted amiss, he is amply able to respond — but we apprehend such is not the fact. Besides we are neither asking the court to enforce a contract, nor lend to us its protection; we are only saying, "let us alone," or only compel us to do that which is just and equitable, and that we are greatly desirous to do without compulsion.

Fifth. The fifth exception it is not necessary to enlarge upon. It assumes, that the agreement of purchase was to substitute the land for the negroes; but that is the complainants' version of the story, which the jury have negatived. Our answer denies this emphatically; there was no such agreement. The land and other property purchased from us would, undoubtedly, when paid for by the trust slaves and other trust funds, take the place of such trust property, and become subject to the same trusts. How their negroes have been " converted" into our land is a matter that we don't realize, and is not shown either by the evidence or the verdict. We have never owned the negroes, and we have never parted with the land.

The plain English of this bill is, to " convert" four slaves, which sold for $850, into land and personal property worth nearly double their value. If the complainants can succeed in this, they will certainly neither " hazard" nor " destroy" the " *trust estate*," but they will hazard and destroy the property of defendant, whose only crime has been to ask a fair value for his property, and to stipulate that he should be paid that price before he parted with it. The complainants have failed in all their engagements, have brought down upon their own heads the consequences of their own faithlessness, and now seek to wrest from us our property, unpaid for, that they may hold it free from any lien for the purchase money.

And will a court aid them in doing this ? That is the true and the only proper issue. All the argument and exceptions about "trust estate," and the " hazard and destruction thereof," are but the drapery which the ingenuity and skill of our learned opponent has hung around the naked skeleton of his client's case. The true, the only question which the Court is called upon to decide is, shall a man be compelled, contrary to his contract, and against his consent, to execute a title of his property to another, who having purchased it at a fair price, has been faithless to all his engagements, and without paying or offering to pay, or admitting a liability to pay, demands from a court of equity to take from us by force our own property and give it to him, as a reward for having broken his promises, and for having subjected us thereby to loss, damage and expense ?

This is the case, the true question, and I fear not the response of this tribunal to such a monstrous proposition.

*By the Court*—LUMPKIN, J. delivering the opinion.

William Pelot conveyed by deed certain slaves to Levi S. D'Lyon, Esq. in trust, for the sole and separate use of his wife Elvina R. Pelot, during her life, and after her death to her children. There are several children in life; and the deed authorized the *cestui que trust*, Mrs. Pelot, by and with the advice and consent of her trustee, to sell and dispose of the trust estate whenever she should deem it proper to do so, and to re-invest the proceeds, &c. upon like trusts. Mrs. Pelot, being desirous of purchasing a small farm near Savannah, contracted with Augustus Myddleton for it, with the approbation of her trustee, at the price of $800. The growing crop, stock, cattle, &c., and the hire of three negro slaves belonging to Myddleton, to assist in the crop till the close of the year, were included in the contract, and all amounted to $1,476. No cash was to be paid, but the payment was to be secured by a mortgage on the four slaves in the trust deed, and also by a mortgage of the land. To consummate the agreement, Mrs. Pelot gave her two notes for $738 each, and also a mortgage on the four slaves owned by her as separate property, which said mortgage was also signed by her trustee. When the title to the land from Myddleton, and the mortgage from Mrs. Pelot and her trustee were exchanged, they were found to be defective; the title made by Myddleton was returned to him, and it was agreed that the title should remain in Myddleton until the notes were paid, as the mortgage which had been made to him had, by mistake, omitted the land. The crop, cattle, &c., and the services of the slaves, all valued at $676, were received by Mrs. Pelot by the consent of her trustee, and the land taken possession of by her. Upon failure to pay the first note, Myddleton foreclosed the mortgage, and sold the slaves in the manner required by law, and received therefrom the net amount of $851 89, which being insufficient to pay the debt, he commenced an action of ejectment against the tenant of Mrs. Pelot for the land. Whereupon the *cestui que trust*, Elvina R. Pelot, and her trustee, filed their bill against Myddleton, to compel him to execute titles to the land.

On the trial Judge Fleming, among other things, charged the jury—

"That if the trust deed empowered Mrs. Pelot to mortgage the trust negroes, the power applied equally to after acquisition of

property, especially when the mortgage was given to secure the purchase money; that the party had full power to make such a contract; it was made with a view to benefit the trust estate; if profitable, such would have been its effect; if loss has accrued, in equity and good conscience it ought to fall on the trust estate. If the property had risen in value to double the price at which it was sold, it would have inured to the benefit of the *cestui que trust;* and it is neither right nor equitable to give all the profit to one and visit all the loss upon the other. That it was not pretended but that the property sold by Myddleton was worth at the time the price agreed to be paid for it. That if it had been squandered, and the negroes sold at an undervalue, by reason of the default of Mrs. Pelot and her trustee to meet the payment, the consequence of this miscarriage should not fall upon Myddleton. That trust property was not to be exempt from the great principle of universal justice, that he who is to have the profit must run the risk.

"It was not denied but that equity would protect the *capital* of trust property from the debts of the *cestui que trust;* but will equity protect trust property from a mortgage given to secure a debt contracted for its benefit? The fact that the defendant knew that he was dealing with trust property, does affect this case, because knowing that fact, he was careful to deal only with those who had authority to deal with him. Whilst therefore it is true that equity will follow trust property in the hands of a purchaser with notice, yet it will not follow trust property in the hands of one authorized to buy. The actual contract, therefore, between these parties, is the one which the jury should enforce. The parties were entirely competent to contract."

The foregoing extract, from the very able charge of the Circuit Judge, contains all that is necessary to the proper hearing and determination of this cause.

The Solicitors for the complainant excepted generally to the instructions of the Court, and more especially —

First. Because, although it be true that Mrs. Pelot had a life estate in the trust property, with remainder to her children, yet by the deed she had no power either with or without the consent of her trustee, to mortgage the trust property, so as to hazard and destroy the trust estate. Her only power under the deed was, to sell the property with the advice and consent of her trustee, and to re-invest the proceeds upon the same uses and trusts; a party, therefore, with knowledge of the trusts, taking a mortgage from

her which he knew she had no right to give, will be followed in equity, so as to prevent the trust estate from being destroyed by such illegal transaction.

Second. Because, Mrs. Pelot had no separate estate in this trust property which enabled her to bind, charge, or alien it by her contract, except in the mode and to the extent declared and authorized by the trust deed, and if she had, it could only be to charge the income during her life in the hands of the trustee, and not to defeat or destroy the remainder.

Third. Because, even if by the deed the parties had the power to mortgage the trust estate, for the purpose of acquiring by purchase other trust property to stand in the place of, and be substituted for the property mortgaged, it does not follow that they would also have power to mortgage at the same time the thing purchased, and thus defeat the remainder; and a person so dealing with them, with full knowledge, would himself become a trustee in equity for the *cestui que trust* in remainder.

Fourth. A court of equity will never suffer trust property, knowing it to be trust property, so to be dealt with, as to break in upon and defeat the rights of remainder men, and consequently a court of equity will not suffer a contract to be enforced through it, nor lend its protection to a party, when it would be productive of such consequences.

Fifth. Because, if property is covered with a trust, no change of its state or form can divest it of such trust, or give the trustee converting it, or those who claim in privity with him, any greater right than before the change. That consequently the negroes being converted, through the means of the mortgage, into the land, with the knowledge of Myddleton that the negroes were covered by the trusts of the deed, the land became in his hands immediately covered with the same trusts.

Judge LUMPKIN, having made the above statement, proceeded as follows:

[1.] There is but a solitary point in this case. Was the contract made with Myddleton authorized by the deed of trust from William Pelot to Levi S. D'Lyon? The argument of complainants' solicitors wholly overlooks, it seems to me, the power expressly given in that instrument to Mrs. Pelot, with the consent of her trustee, to sell and dispose of the whole of the property therein conveyed for the use of herself and children, and to re-invest the proceeds. A power without limitation, except that the property substituted for

the slaves shall be covered with the same trusts.    But for this ample authority the reasoning of counsel might have been conclusive.    At any rate it would have been applicable to the case.

We concur in the opinion, that the power of a married woman, with respect to her separate property, is an unimportant inquiry in the present discussion.    Two opposite rules upon this subject have been laid down totally irreconcilable with each other.    According to one, the *feme-covert* can exercise only the powers conferred upon her by the instrument under which she claims; according to the other, she is as to her separate property, regarded as a *feme-sole,* and capable as such of disposing of it at pleasure, except so far as she may be restrained by the instrument under which she claims. For myself, I am free to avow my adhesion to the doctrine which denies to the wife the power of stripping herself of the provision made for her by a considerate parent or friend, through her devotion to her husband.    Either these settlements should be altogether abolished, or else the helpless and dependent sex should be protected from the *kicks* "and the *kisses* of the husband and the avarice of his greedy, unfeeling creditors."    The contrary creed I hold to be repugnant both to sound legal principles and legislative policy.

With this passing remark I will proceed to review very briefly, the grounds taken in the writ of error.

It is contended that Mrs. Pelot had no power, with or without the consent of her trustee, to mortgage the trust property, so as to hazard and destroy the trust estate.    The reply is obvious, she had the power to sell and dispose and re-invest, and could this be done free from the casualties of trade?    Could she not have sold on credit as well as for cash, and thus have risked the entire loss of the capital, by the failure of the purchaser?    And would this loss have affected the title of the property either in his hands or those claiming under him?

Again; in re-investing the proceeds, might not the whole trust fund have been sunk on account of some defect in the title of the substituted property?    It is evident therefore, that the jeopardy to the trust estate, incident to any and every transaction in which the *cestui que trust* might engage, has nothing whatever to do in determining her powers under the deed of her husband.

Nor is this view weakened at all by looking at the facts before us.    It is conceded that the land and other property sold by Myddleton were worth what they cost.    Can the obligation to pay

be diminished, from the fact that the negroes sold in open market for less than they were supposed to be worth? Will chancery decree the property of Myddleton to the family of Pelot, because the slaves which he settled upon them have come short of discharging Myddleton's *bona fide* debt? The fallacy of such a position is too apparent to be gravely pressed upon the conscience of a court.

If there was in this case any fraud or undue and improper influence used by Myddleton, it would be quite another thing. None such is pretended, and if it were alleged, the complainants would have affirmatively to prove the imposition, and this they have not attempted. It is urged, that Mrs. Pelot had no separate estate in the trust property which enabled her to bind, charge or alien it by her contract. Admit that she had not, and that aside from the power of disposition conferred upon her by the deed, she could only charge the income during her life — all this may be yielded, and still the point in discussion remains untouched. The controversy is, not what Mrs. Pelot might do by reason of her interest in the trust estate, but what were her powers of disposition under the deed? She might have had no interest at all under the instrument, and yet have possessed by delegation from the grantor, the unlimited power of alienation. Granting *ex gratia*, that Mrs. Pelot had the power to mortgage the trust estate, for the purpose of acquiring by purchase other trust property to stand in the place of and be substituted for the property mortgaged, still it is denied that she had the power to mortgage at the same time the thing purchased. This objection like all the rest depends upon the extent of the power given by the deed to Mrs. Pelot. If it is wholly unrestricted, and such is our construction of it, then like any other party capable of contracting, she had the right to make her own bargain; she could have sold the negroes for cash, paid over the proceeds and taken a bond for titles to the land when the final payment was made, or given a mortgage lien upon the land and negroes, as she did, or at any rate intended to do.

In the former case, had Myddleton conveyed titles instead of giving a bond for titles, equity would have protected and enforced his lien on the land for the balance of the purchase money. Shall he be in a worse condition for having withholden the title? In chancery, let it be recollected, that *vendors* of real estate have rights as well as *cestui que trusts*.

As to the fourth and fifth exceptions, we believe that they con-

tain sound law.   It will be time, however, to consider and decide the questions there raised when they are fairly deducible from the pleadings.   We apprehend that it will not be disputed that Pelot himself had the right to insert in the deed of trust, at the time of its execution, any terms he might see fit, consistent with the laws of the land ; and that in the exercise of this discretion he might have imparted such directions as would have periled, necessarily, the very existence of the trust estate, without affording the slightest pretext for the interference of a court of chancery.   He might have provided that the slaves should have been employed on some unprofitable labour ; that they should have been managed by a most improvident trustee ; that they should be hired annually to an irresponsible person, and that the power of selling them and re-investing the proceeds be confided to the most incompetent hands. Upon what pretext would equity have interposed and granted relief ?   As well might chancery lay hold of the property of the drunken father, to save and secure it to his innocent offspring.

It was doubted in the very earliest cases whether a *feme-covert* could exercise a power *expressly given.*   1 *Ch. Cas.* 18 ; *Blithe's Case,* 2 *Free.* 91 ; *Godolphin* vs. *Godolphin,* 1 *Ves.* 21 ; *Sug. Powers,* 155.   The result of the argument submitted on behalf of the plaintiff in error would be virtually to deprive her of this power.

As to the land being covered with the same trusts as the negroes, it will be time enough to assert that claim when it is paid for. Until then it belongs to Myddleton, and to no one else.   Once paid for, it unquestionably becomes immediately encumbered with the same trusts as the slaves; and this, too, not only upon general principles, but by the very terms of the deed itself.

Thus we have felt it our duty, only to examine the terms of Pelot's deed, and to ascertain the nature and extent of the powers conferred by it; and from the best consideration we can give the subject, we are fully confirmed in the correctness of the very clear and forcible opinion pronounced on the trial below.   We are content to adopt it as our own.   The decree must therefore be affirmed.